Sonny HOLMES and Murry Holmes *v.*
Charlie McCLENDON Jr. and the Estate of
Brenda Lee Holmes McClendon, *Deceased*

01–1303 76 S.W.3d 836

Supreme Court of Arkansas
Opinion delivered June 6, 2002

*Butler, Hicky, Long & Harris*, by: *Fletcher Long, Jr.*, for appellants.

*Easley, Hicky & Hudson*, by: *B. Michael Easley*, for appellees.

D ONALD L. CORBIN, Justice. This appeal involves an alleged conflict of interest resulting from one attorney's representation of competing interests in a wrongful-death action. On August 21, 1999, Appellee Charlie McClendon Jr. was severely injured in a head-on collision that also took the lives of his wife, Brenda Lee Holmes McClendon, and his minor daughter, Kayla McClendon. Charlie was appointed as personal representative and administrator of his wife's and daughter's estates by the St. Francis County Probate Court. Charlie hired attorney B. Michael Easley to represent him, individually, in a personal-injury suit against the tortfeasors and to represent the beneficiaries of his wife's and daughter's estates in wrongful-death actions. Easley's proposed contingency fee was subsequently approved by the probate court.

Easley was successful in procuring a total settlement of $1,100,000 from the tortfeasors and insurance carriers. Of the settlement, Charlie received $440,000 for his personal-injury claim. Brenda's estate received an equal amount, $440,000, for her wrongful death, and Kayla's estate received $220,000. Charlie was the sole beneficiary of his daughter's estate; thus, he received the entire settlement, minus attorney's fees. There were four additional beneficiaries of his wife's estate, namely Brenda's parents, Appellants Sonny and Murry Holmes, and Brenda's sisters, LaNan Holmes Kennedy and Lou Holmes Blaylock. The settlement awarded to Brenda's estate was eventually distributed by the St. Francis County Circuit Court, which presided over the wrongful-death action, one-half to Charlie and one-half to the Holmeses.[1] Easley was awarded a fee from the total settlement by the probate court. The Holmeses objected to Easley receiving any fee from their portion of the settlement. They argued that Easley had not adequately represented their interests as beneficiaries of Brenda's estate, and that a conflict of interest had arisen as a result of Easley's representation. The probate court found that there was no conflict of interest; however, the court reduced the percentage

---

[1] Although it is unclear from the record before us, it appears that Brenda's sisters eventually withdrew any claims that they had to the wrongful-death settlement. Hence, they are not parties to this appeal.

of Easley's fee due from the Holmeses' portion by twenty-five percent.

On appeal, the Holmeses argue that the probate court erred in finding that there was no conflict of interest and in ordering them to pay a portion of their settlement proceeds to Easley for his attorney's fee. Charlie raises one point on cross-appeal, that the probate court erred in reducing the Holmeses' portion of Easley's fee by twenty-five percent. This appeal was certified to us pursuant to Ark. Sup. Ct. R. 1-2(a)(5), as it presents an issue regarding the practice of law. We review probate proceedings *de novo*, but we will not reverse the decision of the probate court unless it is clearly erroneous. *See Mayberry v. Flowers*, 347 Ark. 476, 65 S.W.3d 418 (2002); *Dillard v. Nix*, 345 Ark. 215, 45 S.W.3d 359 (2001). When reviewing the proceedings, we give due regard to the opportunity and superior position of the probate judge to determine the credibility of the witnesses. *Id*. We find no error and affirm.

## Conflict of Interest

For reversal, the Holmeses argue that the probate court erred in awarding Easley attorney's fees from their portion of the recovery for Brenda's wrongful death. They claim that he is not entitled to any fee because he was representing conflicting interests. They allege two distinct conflicts. First they claim that a conflict arose during the procurement of the settlement, due to Easley's simultaneous representation of Charlie, individually, and as personal representative of both Brenda's and Kayla's estates. They argue that because there was a finite amount of money available to pay all three claims, each dollar that Charlie received for his personal claim and as the sole beneficiary of Kayla's estate would necessarily diminish the amount available for distribution to the other beneficiaries of Brenda's estate. Second, they assert that a conflict arose during the distribution of the proceeds awarded to Brenda's estate. They argue that Easley was not adequately representing the interests of all the beneficiaries.

Charlie argues that both conflict-of-interest arguments are unfounded. He contends that the arguments are merely an

attempt by the Holmeses to relieve themselves of having to pay Easley's fee on top of the contingency fee that they agreed to pay their separate attorney, Fletcher Long Jr. He points to the fact that from the outset of the probate case, the Holmeses have contended that they should be allowed to retain their own independent counsel to procure a separate settlement of the wrongful-death suit, and that they should only be responsible for paying their attorney's fee. He further contends that no conflict, legal or factual, arose until after the settlement had been procured and distribution was begun. We agree.

 Arkansas Code Annotated § 16-62-102(b) (Supp. 2001) provides that every wrongful-death action shall be brought by and in the name of the personal representative of the deceased person; if there is no personal representative, then the action shall be brought by the heirs at law of the deceased person. It is the duty of the personal representative, not the beneficiaries, to choose counsel to pursue a wrongful-death claim. *Brewer v. Lacefield*, 301 Ark. 358, 784 S.W.2d 156 (1990). The beneficiaries are free to select their own counsel to see that their interests are protected; however, they must bear this expense in addition to any fee awarded to counsel chosen by the personal representative. *Id.* In fact, the probate court lacks jurisdiction to award any attorney's fees for services rendered to an individual beneficiary. *Id.* There are, however, alternative ways to protect the interest of the beneficiaries, without requiring them to pay for separate counsel:

> Should the personal representative or chosen counsel fail to provide adequate representation, *application can be made to the probate court to either not approve or disallow the contracts entered into by the representative. In fact, a representative can even be removed if the court finds him or her unsuitable.* Ark. Code Ann. § 28-48-105 (1987).

*Id.* at 363, 784 S.W.2d at 159 (emphasis added).

██ ██ It is inevitable that potential conflicts of interest frequently will arise between beneficiaries in wrongful-death actions. *See Standridge v. Standridge*, 304 Ark. 364, 803 S.W.2d 496 (1991). This court has previously observed:

> In view of the statutory priorities for selection of personal representative, it is likely that the personal representative will be a ben-

> eficiary who may have to share a limited recovery with others. Although counsel is hired by the personal representative, the wrongful death action is brought, in effect, on behalf of the beneficiaries. Clearly counsel owes a duty to present the claim of each beneficiary fairly and should not attempt to get a more favorable distribution for one at the expense of another.

*Id.* at 373, 803 S.W.2d at 501. Notwithstanding the potential for conflict in such situations, this court has previously recognized that simultaneous representation of the personal representative and the surviving relatives, in and of itself, does not amount to a conflict of interest, such that the beneficiaries would be entitled to separate representation in a wrongful-death claim. *Brewer,* 301 Ark. 358, 784 S.W.2d 156. Rather, there must be positive proof that the beneficiaries' interests were not adequately represented by the personal representative. *Id.*

In *Brewer,* as an example of positive proof of inadequate representation, this court cited a decision from the Illinois Court of Appeals, *Johnson v. Village of Libertyville,* 150 Ill. App. 3d 971, 502 N.E.2d 474 (1986), *overruled on other grounds in Mio v. Alberto-Culver Co.,* 306 Ill. App. 3d 822, 715 N.E.2d 309 (1999). In *Johnson,* the decedent's surviving spouse, as personal representative, filed a wrongful-death suit; however, the complaint did not include a count for loss of society by the decedent's parents. The parents filed a motion to intervene, alleging that there was a conflict between their interests and those of the personal representative, since his interest was in maximizing his degree of dependency and loss of consortium, while minimizing their claim for loss of society. The Illinois appellate court held that the parents had a right to intervene, because it was clearly shown that the personal representative, by failing to acknowledge the parents' claim, had acted in a manner indicating that he would not adequately represent the interests of the parents. The court held:

> [T]he mere fact that the administrator as surviving spouse had a personal interest in the outcome of this Wrongful Death action is not so conflicting, nor an interest so adverse to that of the petitioners that both cannot be adequately represented by the plaintiff . . . . *[W]e do not find that there is a conflict of interest simply because the heirs and the personal representative might have interests that conflict*

> *in the wrongful death award. In other words, intervention is permitted*
> *here only because there is positive proof that the next of kin will not be*
> *adequately represented.*

*Brewer*, 301 Ark. at 364, 784 S.W.2d at 159-60 (emphasis added) (quoting *Johnson*, 150 Ill. App. 3d at 975-78, 502 N.E.2d at 477-79). With the foregoing precedent in mind, we review the relevant facts presented in this case.

On December 2, 1999, the probate court appointed Charlie as personal representative and administrator of his wife's estate and authorized him to pursue a wrongful-death action on behalf of the beneficiaries. Charlie retained Easley as counsel to pursue the wrongful-death action. The Holmeses did not object to Charlie's appointment, nor did they contest his right, as personal representative, to retain counsel to pursue the wrongful-death action. However, they asked the probate court to allow them to retain their own separate counsel, Long, to present their separate claims against the tortfeasors. They also asked to be allowed to have a separate compensation agreement with their counsel, such that they would only be responsible for paying Long's fee and not Easley's.

The probate court denied the Holmeses' requests, concluding that it is the right and duty of the personal representative, not the beneficiaries, to choose counsel and pursue a wrongful-death claim. The court permitted the Holmeses, as statutory beneficiaries, to select their own counsel to see that their interests were protected, but the court ruled that they must bear those costs themselves. The order reflected that the attorney's fees approved by the court would only address those fees for Easley, as he was the attorney chosen by the personal representative. The probate court later approved a contingency fee of twenty-five percent of any settlement to Easley, with the percentage increasing if the case was tried and appealed.

Some time in March 2000, Easley secured the maximum amount of recovery from the tortfeasors, in the amount of $1,000,000. He later succeeded in recovering the limits of Charlie's and Brenda's underinsured-motorist coverage, in the amount of $100,000. Easley proposed a settlement of the $1,100,000 as

follows: Charlie would be awarded $440,000 for his injuries; Brenda's estate would be awarded $440,000, for her wrongful death; and Kayla's estate would be awarded $220,000, for her wrongful death. Easley also proposed that the amount awarded to Brenda's estate be distributed three-fourths to Charlie and one-fourth to the Holmeses, with Easley's fee being assessed on the entire settlement. The Holmeses rejected the distribution offer.

Because the Holmeses had rejected the proposed distribution, Easley filed a petition on March 17, 2000, asking the circuit court to distribute the settlement funds in Brenda's estate amongst the statutory beneficiaries, pursuant to section 16-62-102(g). On April 11, 2000, Easley withdrew from his representation of Charlie individually and agreed not to participate in the circuit court hearing on the issue of distribution. Attorney Dan Felton then entered his appearance as counsel for Charlie.

On April 26, 2000, Easley filed in the probate court a petition for authority to settle the wrongful-death claim for Brenda's estate. The petition sought approval to settle the wrongful-death claim for $400,000, payable from the tortfeasors, and $40,000, payable from the underinsured-motorist carrier. The petition also sought the preapproved attorney's fee of twenty-five percent and costs of $1,396.87. The petition asked that the fee and costs be paid immediately, but that the remainder of the funds be used to purchase a certificate of deposit, so that it would draw interest until the circuit court could determine the amounts to be distributed to each of the statutory beneficiaries.

On May 5, 2000, the Holmeses filed in the probate court a petition to have Easley removed from his representation of Brenda's estate on the ground that a conflict existed between the beneficiaries' interests and Charlie's personal interest.[2] The petition did not allege any specific wrongdoing or misconduct on Easley's part, only that:

---

[2] Interestingly, Easley had previously filed a petition in the circuit court seeking to have Long removed from the case on the ground that, for a period of several months, Long had represented Charlie in a custody matter while simultaneously representing the Holmeses in this matter.

There is a limited amount of money available for distribution among Mr. McClendon, individually, and the two McClendon Estates. There is a conflict of interest for any lawyer to try to represent all three entities as their interests compete.

On May 18, 2000, the probate court held a hearing on the petition to settle Brenda's estate. During the hearing, counsel for the Holmeses informed the court that the Holmeses did not "have any objection to the settlement as such," but that they would like for Easley to explain the requested costs and present "some proof of the reasonableness of the attorney's fees." The probate court then allowed Long to question Easley about his fees. At one point during the exchange, Long asked Easley what percentage of his time spent on Brenda's wrongful-death claim was "devoted to maximizing the amount of money that Charlie is going to receive from that estate and at the same time minimizing the amount of money that your other clients, the Holmes[es], are going to receive as a result of that settlement?" Easley responded "Twenty percent. Something like that." Long then suggested that the Holmeses were, in effect, being asked to pay Easley, out of their share of the recovery, for his efforts in actually diminishing what they were to recover. Easley responded that he supposed that was right. Later, the probate court allowed Easley an opportunity to explain the situation, wherein he stated:

> [T]he position taken by the Holmes[es] in this matter has been unreasonable and has caused us huge delay . . . . All along, Your Honor, we have had to . . . butt up against arguments that flew in the face of the law. Fletcher and the Holmes[es], from the very beginning, have taken the position that they are entitled not to have a fee assessed on their portion of any settlement and the law is absolutely contrary. . . . I would not have had to do virtually any of the work that I had to do in that 25% of the time that I [was] having to work versus them. . . . And so my testimony to you is, Your Honor, is that virtually every bit of the time that I have had to spend as Fletcher indicates in opposition to the Holmes[es]' position has been because those positions of the Holmes[es] have been contrary to law and, in my opinion, unreasonable.

At the conclusion of the hearing, the probate court ruled that the overall contingency fee of twenty-five percent was appropriate. However, because Easley admitted that twenty-five percent of his time was spent in opposition to the Holmeses, his fee derived from their portion of the settlement would be reduced by twenty-five percent, such that the Holmeses would only pay Easley a fee of eighteen and three-fourths percent. A written order was entered on June 1, 2000, wherein the probate court authorized the settlement of the wrongful-death claim in the amount of $440,000 and awarded Easley a twenty-five percent fee, except that the fee assessed on the Holmeses' portion would be reduced by twenty-five percent.

A hearing was subsequently held in the circuit court regarding distribution of the settlement awarded to Brenda's estate. Initially, in January 2001, the circuit court awarded Charlie $200,000 and the Holmeses' $240,000. However, the parties later agreed to split the settlement equally, with Charlie receiving $220,000 and the Holmeses receiving $220,000. An order reflecting this settlement was entered by the circuit court on February 20, 2001.

Despite the fact that the parties had agreed to the amounts distributed, the Holmeses still contested the issue of Easley's attorney's fees. On March 29, 2001, another hearing was held in the probate court, wherein the Holmeses again contended that their share of Brenda's estate should not be reduced by any amount of attorney's fees due Easley. They again claimed that Easley had not represented their interests in the same way that he had represented Charlie's and that, accordingly, Easley's representation of both Charlie, individually, and as the personal representative of Brenda's estate, created a conflict of interest. They asserted that because there was a conflict of interest, Easley was entitled to no fee from them.

The probate court disagreed with the Holmeses and entered an order in favor of Charlie and Easley on July 26, 2001. The probate court found that Easley was entitled to a fee from the entire settlement for bringing the litigation to a successful conclu-

sion and securing the maximum amount available from the tortfeasors and the insurers. The probate court ruled that no conflict of interest existed. In arriving at this conclusion, the court made the following findings: (1) Easley was successful in procuring a fair settlement with the tortfeasors; (2) the settlements of both Brenda's and Kayla's estates were approved by the probate court; (3) no factual conflict arose until after the settlement was procured and approved; (4) the conflict was only as to the distribution of the settlement amongst the beneficiaries; and (5) Easley removed himself from representing Charlie, individually, and advised Charlie to hire other counsel once the conflict over distribution of the proceeds became apparent. The court's order reflects in pertinent part:

> 9. This court cannot find sufficient evidence to support a finding that there was, or is, a conflict on the part of Mr. Easley. As stated, he was successful in securing a fair settlement on behalf of all three claimants. The controversy arose over the distribution of proceeds in Brenda's estate. Mr. Easley stepped aside at that point. Mr. Long protected the interests of the Holmes[es].

Based on these findings, the probate court upheld its previous ruling that Easley was entitled to a contingency fee based on the entire settlement, except that the fee due from the Holmeses' portion would be reduced by twenty-five percent.

We cannot say that the probate court's findings are clearly erroneous. Our case law has consistently held that the personal representative, and only the personal representative, may bring a wrongful-death action and may choose an attorney to pursue such action. *See Brewer*, 301 Ark. 358, 784 S.W.2d 156; *Cude v. Cude*, 286 Ark. 383, 691 S.W.2d 866 (1985). Our case law has also held that should the individual beneficiaries feel that their interests are not adequately protected by the personal representative and the attorney chosen by the personal representative, they may hire their own attorney, but at their own expense. *Brewer*, 301 Ark. 358, 784 S.W.2d 156. In accordance with our case law, the Holmeses were fully informed at the outset that, although they had the right to hire their own attorney to protect their interests, they would be

responsible for paying him, above and beyond the fee that would be paid to Easley. Notwithstanding, the Holmeses chose to hire their own counsel. By later raising the conflict-of-interest issue, the Holmeses were apparently seeking to do indirectly that which they were not able to do directly.

On the issue of conflict of interest, the Holmeses have failed to present positive proof that Easley was not adequately representing all the beneficiaries in pursuing the wrongful-death claim. Unlike the example relied upon in *Brewer*, 301 Ark. 358, 784 S.W.2d 156, the wrongful-death suit filed by Easley on behalf of Brenda's estate acknowledged the Holmeses' claim and reflected that they had endured mental anguish, grief, and despair over the loss of their daughter and would continue to experience the same in the future. The Holmeses presented no proof showing that Easley was not acting on behalf of all the beneficiaries in procuring the settlement from the tortfeasors and insurers.

Indeed, they did not make any real assertion of a conflict of interest until after the settlement had been procured, when the dispute arose as to the distribution of the funds awarded to Brenda's estate. Prior to that time, the Holmeses had merely taken the position that a *potential* for conflict existed. As stated above, the potential for conflicts is present in many wrongful-death cases, as the personal representative will often be a statutory beneficiary. We agree with the probate court, however, that the attorney's fees awarded in this case were earned by Easley in the procurement of the favorable settlement on behalf of Brenda's estate. Thus, by the time that the Holmeses actually alleged that a conflict of interest existed, Easley had already earned his fee. The fact that a dispute later arose as to distribution of the settlement proceeds in no way diminishes Easley's efforts in securing the settlement. *See Standridge*, 304 Ark. 364, 803 S.W.2d 496 (holding that the fee was earned by the attorneys in pursuing the wrongful-death action, and not in the manner in which they proposed division or distribution of the recovery).

 In sum, we affirm the probate court's finding that no legal conflict of interest existed from Easley's simultaneous representation of Charlie, individually, and as the personal representative of both his wife's and daughter's estates. Indeed, even when a factual dispute arose as to distribution of the settlement proceeds, the record is clear that Easley withdrew from his representation of Charlie and stepped aside so that the circuit court could fix the share of each beneficiary. Accordingly, we cannot say that the probate court erred in awarding Easley a contingency fee from the total settlement, including that portion distributed to the Holmeses. We thus affirm on this issue.

## Cross-Appeal

 For his point on cross-appeal, Charlie argues that the probate court erred in reducing Easley's fee on that portion of the wrongful-death proceeds awarded to the Holmeses. The decision to award attorney's fees and the amount of an award are discretionary determinations that will be reversed only if the appellant can demonstrate an abuse of discretion. *See Boatmen's Trust Co. v. Buchbinder*, 343 Ark. 1, 32 S.W.3d 466 (2000); *Nelson v. River Valley Bank & Trust*, 334 Ark. 172, 971 S.W.2d 777 (1998); *Security Pac. Housing Servs., Inc. v. Friddle*, 315 Ark. 178, 866 S.W.2d 375 (1993); *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990). Due to the trial judge's intimate acquaintance with the record and the quality of service rendered, we usually recognize and defer to the superior perspective of the trial judge in assessing the applicable factors. *Id.*

As discussed above, the probate court initially approved the fee proposal filed by Easley, wherein he would receive a contingency fee of twenty-five percent, if the matter did not go to trial; thirty-three and one-third percent, if the matter was tried; and forty percent, if the matter was appealed. A written order reflecting as much was entered in February 2000. In April 2000, Easley filed a petition seeking authority to settle the wrongful-death suit filed on behalf of Brenda's beneficiaries for $440,000. Easley

claimed that he was entitled to a fee of twenty-five percent of the settlement.

A hearing was held in the probate court on May 18, 2000, during which the Holmeses subsequently challenged the reasonableness of Easley's twenty-five percent fee. It was during this hearing that Long elicited testimony from Easley to the effect that twenty-five percent of Easley's time on the case had been spent in opposition to the actions taken by the Holmeses, which Easley contended was a direct result of the Holmeses taking positions that were contrary to the law.

 Based on Easley's testimony, the probate court ruled that the overall contingency fee of twenty-five percent was appropriate. However, because Easley admitted that twenty-five percent of his time had been spent in opposition to the Holmeses, his fee derived from the Holmeses' portion would be reduced and the Holmeses would only be required to pay a fee of eighteen and three-fourths percent from their portion. Given our standard of review of awards of attorney's fees, we must affirm, as Easley has failed to demonstrate that the probate court abused its discretion in reducing that part of his fee due from the Holmeses. The probate judge was intimately acquainted with the record and the quality of service rendered, and we will defer to his superior perspective in assessing the fee.

Affirmed on direct appeal; affirmed on cross-appeal.

GLAZE, J., would reverse on cross-appeal.

IMBER, J., not participating.